FOR PUBLICATION

**UNITED STATES BANKRUPTCY COURT**

**EASTERN DISTRICT OF CALIFORNIA**

In re:                       )

ANGELO MARTEL LOVE,        )    Case No. 19-20532-C-7
CHRISTINE MARIE LOVE,      )    Chapter 7
           Debtors.       )
_____ )    Adversary No. 21-02045-C

CHRISTINE MARIE LOVE,      )
          Plaintiff,     )    **OPINION**

v.                        )

UNITED STATES DEPARTMENT OF   )
EDUCATION, FEDLOAN SERVICING,  )
NELNET                  )
          Defendants.    )
_____ )

Before: Christopher M. Klein
United States Bankruptcy Judge

CHRISTOPHER M. KLEIN, Bankruptcy Judge:

     This was an "undue hardship" student loan discharge trial. This trier of fact finds by preponderance of evidence that the self-represented debtor plaintiff demonstrated "undue hardship on the debtor and the debtor's dependants" within the meaning of 11 U.S.C. § 523(a)(8).

     Despite widespread belief that student loans are virtually impossible to discharge in bankruptcy, the § 523(a)(8) tool that Congress placed in the judicial toolbox in 1978 to assess "undue hardship" is adequate to the task if only the bar and the bench correctly do their jobs. Litigants must present factual evidence of "undue hardship" that enables trial courts to make findings of fact and conclusions of law by preponderance of evidence to be reviewed on appeal for "clear error."

It is time to demythologize unwarranted and fallacious dogmas and propaganda that have encrusted, ossified, neutralized, and transmogrified § 523(a)(8) analysis into a misconception that student loan debt is virtually impossible to discharge, even though the "undue hardship" standard of proof is preponderance of evidence and the standard of appellate review is "clear error."

It is a paradox. Only the most compelling cases seem to be able to qualify for discharge as "undue hardship" on a standard of proof that is preponderance of evidence.

The solution follows from the Supreme Court's explication of the proper roles of trial and appellate courts facing "mixed questions" of law and fact and proper standard of review. U.S. Bank Nat'l Ass'n v, Village at Lakeridge, 138 S.Ct. 960 (2018).

Student loan "undue hardship" questions depend intensely on the facts of each case. As such, they are mixed questions of law and fact in which factual questions predominate over legal analysis that must, if there has been a trial, be reviewed on appeal under the deferential "clear error" standard. If there has been a trial with findings of fact and conclusions of law, then appellate review must be under the "clear error" standard that does not permit appellate courts to substitute judgment for that of the trial court. Lakeridge, 138 S.Ct. at 966-67.

Mindful that factual questions predominate in a § 523(a)(8) mixed question of law and fact, this court hereby makes findings of fact and conclusions of law determining that excepting the subject debt from discharge would constitute an "undue hardship" on the debtor and her dependents.

## Facts

These findings are rendered after a trial during which the self-represented plaintiff testified and was cross-examined by defendants' counsel. Supplemental Findings are being filed under seal because some of the relevant facts are intensely private and personal. Permitting them to be published by those who routinely post findings on the internet would chill the willingness of litigants to provide candid testimony about sensitive matters that are relevant and material to issues before the court.[1]

Christine Love owes the United States Department of Education about $27,270 for student loans incurred between 2016 and April 2018 while studying Healthcare Administration at Ashford University, a proprietary school that closed under a storm of litigation by the California Attorney General.[2] She may also be exposed to liability for about $57,697 in student loans incurred by her now-former spouse.

The studies at Ashford have produced no discernable improvement in her employment opportunities.

She was forced to abandon her studies due to debilitating injuries suffered at the hands of her now-former husband. The

---

[1] This court on its own motion is exercising its protective authority under 11 U.S.C. § 107(b)(2) relating to potentially scandalous or defamatory matter and under 11 U.S.C. § 107(c) because this court finds disclosure would create undue risk of unlawful injury to the individual debtor.

[2] The California Attorney General obtained a judgment against Ashford "for misleading students about career outcomes, cost and financial aid, pace of degree programs, and transfer credits in order to entice them to enroll at Ashford." Statement of Dec., at p. 47, People of the State of California v. Ashford University, LLC, et al., Case No. 37-2018-00046134-CU-MC-CTL, March 3, 2022.

ensuing divorce action terminated marital status in August 2019, leaving for future resolution property division of the family home. Her husband was sentenced to 6.7 years in state prison.

With spouse in prison and with two minor children, Love could not afford to pay current debts. The voluntary chapter 7 case was filed January 30, 2019.

Love's "current monthly income" was $3,390.09 from employment as a Pharmacy Technician. After taxes and insurance, her monthly income was $2,834.87. Her monthly expenses were $3,949.00. She received gifts from her grandmother to help pay bills. Her annual gross income of $40,681.08 was 43 percent of the state's median family income for her size family.[3]

A Notice to File Claims was issued after the chapter 7 trustee made a finding of assets.

The United States Department of Education filed two timely proofs of claim totaling $88,019.86.[4] Of that total, $28,249.86 was owed by Love as the borrower. The trustee paid a total of $3,052.85 ($2,073.05 + $979.80) on those claims.[5]

In this action, Love seeks discharge of all her liability for student loans. That includes both her direct remaining debt of $27,270.06 and any potential liability she may have for her now-former spouse's remaining debt of $57,697.14.

The United States concedes that Love has never been in

---

[3]All numbers from Official Forms 106I, 106J & 122A-1.

[4]Claim #11-1, US Dept of Ed c/o NELNET, $59,770.19, borrower Angelo Love; Claim #13-1 US Dept of Ed c/o FEDLOANSERVICING, $28,249.86, borrower Christine Love.

[5]Trustee's Final Report, Dkt #30, filed, 9/11/2019.

default on student loans. In addition to the $3,052.85 paid in the chapter 7 case, Love made voluntary additional payments of $50.59. She was approved for a "REPAYE" flexible repayment plan with $10.00 monthly payments beginning in February 2019 and made payments under that plan. In January 2021, she was notified the monthly REPAYE payment would increase to $284.20 per month. This adversary proceeding was filed in June 2021.

Love received assistance from the California Keep Your Home program in order to help with her mortgage, at a cost of an $18,000 lien that eventually will have to be repaid.

Love has a history of diligent work for over 20 years in low-paying jobs and of striving to improve her lot in life. From 2000 until 2013 she worked in assisted living facilities in various humble capacities. She has since worked as a medical records technician and as pharmacy technician. She presently is employed in a clerical position reviewing health-care claims for audits. She believes that she has reached her maximum income potential. This court agrees and so finds.

Her grandmother explained that she helps Love with "food, gas, and occasional household necessities and bills due to her financial struggles." The court believed that testimony, to which there was no objection.

This court likewise believed Love's testimony about her minimal standard of living. There are no luxuries in her budget. The evidence reveals a need for continuing medical care due to her lingering physical injuries.

Based on observing Love's credible testimony, this court finds that she is sincere, hard-working, and has made an honest

effort in good faith to address her student loan debt.

Moreover, this court finds that Love does not have significant prospects for future increases in income beyond the rate of inflation and finds that this state of affairs is likely to persist indefinitely. She is doing the best she can in coping with the challenges of life.

## Jurisdiction

Subject-matter jurisdiction is founded on 28 U.S.C. § 1334(b). Determinations of dischargeability of student loans are core proceedings a bankruptcy judge may hear and determine. 28 U.S.C. § 157(b)(2)(I).

## Analysis

Student loan "undue hardship" issues under § 523(a)(8) are assessed in the Ninth Circuit under the three-part "Brunner Test," borrowed from the Second Circuit. United Student Aid Funds, Inc. v. Pena, 155 F.3d 1108 (9th Cir. 1998); Brunner v. New York State Higher Educ. Serv. (In re Brunner), 831 F.2d 395 (2d Cir. 1987). Ms. Love's situation is examined here through the Brunner prism, focusing on what Brunner and Pena actually held.

I

## Brunner Test

The first step of the three-part Brunner test is: the debtor "cannot maintain, based on current income and expenses, a 'minimal' standard of living for [self] and dependents if forced to repay the loans." Pena, 155 F.3d at 1111; Brunner, 831 at 396.

Second, the debtor must show that "additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans." Pena, 155 F.3d at 1111; Brunner, 831 at 396.

Third, the debtor "has made good faith efforts to repay the loans." Pena, 155 F.3d at 1111; Brunner, 831 at 396.

A

Pena and Brunner make a fascinating pair because their facts led to opposite conclusions regarding "undue hardship." Each involved versions of § 523(a)(8) that permitted automatic discharge regardless of hardship after the lapse of a specified period. The issue in each was early discharge based on "undue hardship" in lieu of waiting for the statutory period for automatic discharge to elapse.

They presented two sides of the same coin. Using the same test, the Second and Ninth Circuits each affirmed decisions that had reached opposite conclusions regarding the existence of "undue hardship." The facts made all the difference.

B

Applying the Brunner Test in the Ninth Circuit

Accepting that Brunner is the law of the Ninth Circuit, how Brunner is actually applied in the circuit is important. One gains useful insights by comparing and contrasting the respective successful and unsuccessful assertions of "undue hardship" in Pena and Brunner. The standard of appellate review looms large in discerning the appropriate "undue hardship" analysis.

1

## Minimal Standard of Living on Current Income

The first element of the <u>Brunner</u> test is "cannot maintain, based on current income and expenses, a 'minimal' standard of living for [self] and dependents if forced to repay the loans."

Monthly income and monthly expenses were addressed separately by the Ninth Circuit in <u>Pena</u>.

There was evidence that the Penas' monthly income fluctuated. The Ninth Circuit ruled it was not "clear error" for the bankruptcy court to determine monthly income as $1,748 based on the sum of take-home pay at the time of filing of $1,370 plus a fixed disability payment of $378. Although there was evidence that wages had increased between discovery and time of trial, there also was evidence that income fluctuated. Hence, the Ninth Circuit ruled, "we accept as not clearly erroneous the bankruptcy court's finding that the Penas' monthly net income was $1,748." <u>Pena</u>, 155 F.3d at 1112.

As to monthly expenses, the Ninth Circuit affirmed as not clearly erroneous the bankruptcy court's averaging of monthly expenses at three stages of the proceeding – when schedules were filed, when interrogatories were answered, and time of trial. It specifically rejected the argument that "current" income under the <u>Brunner</u> test means the time of trial: "where evidence suggests that the debtor's income or expenses tend to fluctuate, it is not inappropriate to average figures over a reasonable period of time." <u>Pena</u>, 155 F.3d at 1112.

Comparing average monthly expenses ($1,789) and net monthly income ($1,748) there was a deficit of $41. In view of that $41

monthly deficit, the Ninth Circuit ruled: "Clearly, in these circumstances the Penas could not maintain a minimal standard of living and pay off the student loans." Pena, 155 F.3d at 1113.

That conclusion satisfied the first Brunner element in Pena.

2

Additional Circumstances

Next, the debtor must show that "additional circumstances" exist indicating that the inability to maintain a minimal standard of living will "persist for a significant period of the repayment period of the student loans."

In Pena, two factual findings by the bankruptcy court satisfied the second Brunner element: First, there was the finding of Mrs. Pena's ongoing mental disability about which she testified as impairing her ability to obtain "meaningful permanent employment." The Ninth Circuit rejected the proposition that expert corroboration of the medical condition was required, reasoning that the trial court was entitled to believe her testimony and that the existence of a back disability award, as well as receipt of ongoing disability payments sufficed such that it was not clear error for the trial court to conclude that the condition would persist.

The Ninth Circuit distinguished Pena from Brunner as different because in Brunner there was no evidence that Ms. Brunner's mental state impaired her capacity to work. Pena, 155 F.3d at 1113-14.

Second, as other evidence, the Ninth Circuit ruled that low value of the education provided is "relevant to [the student's]

future ability to pay off the student loans." Specifically, the loans incurred to pay ITT Technical Institute yielded a credential as "Associate in Specialized Technology" that was useless to Mr. Pena because it did not help him in his employment and was not accepted by other colleges for course work credit.

Hence, the "bankruptcy court did not err in considering that [Mr. Pena's] income was not likely to increase as a result of his ITT education." <u>Pena</u>, 155 F.3d at 1114.

These findings satisfied the second <u>Brunner</u> prong.

3

<u>"Good Faith" Effort to Repay Loans</u>

As to "good faith," the Ninth Circuit ruled the "bankruptcy court did not clearly err in finding that the Penas exhibited good faith in attempting to pay back the student loans."

The record showed that there had been "several" payments and "after being laid off ..., the debtors were given a 90-day deferment, but then were unable to meet their obligations and filed chapter 7." This sufficed to support the bankruptcy court's finding of "good faith" efforts to repay the loans.

The Ninth Circuit rejected the argument that good faith was undermined by their use of Mrs. Pena's $8,000 back disability benefit award to buy a used car and pay other bills.[6]

─────────

[6]The Ninth Circuit explained:

USA Funds does not suggest why good faith would have required the Penas to pay the student loan debt prior to paying down portions of their other debts ($43,360 minus $8,685) when the other debts were approximately four times the amount of the student loans.

1    Contrasting the Pena's situation with the facts in <u>Brunner</u>,
2    the Ninth Circuit noted that Ms. Brunner failed to establish good
3    faith because she filed for discharge within a month after the
4    first payment of her loans came due, made virtually no attempt to
5    repay, and never requested the available deferment of payment
6    that was available to those who are unable to pay because of
7    prolonged unemployment. <u>Pena</u>, 155 F.3d at 1114.

8    Hence, in <u>Pena</u> "several" payments and brief deferment during
9    a job loss, followed by a chapter 7 filing, sufficed to satisfy
10   the "good faith" prong of Brunner against attack as clear error.

11

12                              C

13            <u>Ninth Circuit Decisions After Pena</u>

14   The Ninth Circuit's first noteworthy student loan decision
15   in the shadow of <u>Pena</u> was <u>Saxman</u> in 2003, ruling that bankruptcy
16   courts have equitable power to partially discharge student debt
17   to the extent payment would constitute an "undue hardship."
18   <u>Saxman v. Educ. Credit Mgmt. Corp. (In re Saxman)</u>, 325 F.3d 1168
19   (9th Cir. 2003); <u>cf.</u> <u>Graves v. Myrvang (In re Myrvang)</u>, 232 F.3d
20   1116 (9th Cir. 2000) (§ 523(a)(15)).

21   In other words, bankruptcy courts have equitable power to
22   scale down student loan debt. <u>E.g.</u>, <u>Nitcher v. Educ. Credit Mgmt.</u>
23   <u>Corp. (In re Nitcher)</u>, 606 B.R. 67, 80 (Bankr. D. Or. 2019).

24   Another key Ninth Circuit decision in the wake of <u>Pena</u> was
25   <u>Hedlund</u>, a partial discharge case in which the Ninth Circuit
26   clarified and enforced the standard of review for "undue

27

28   _____

     <u>Pena</u>, 155 F.3d at 1114.

                              11

hardship" determinations made by bankruptcy judges.

In <u>Hedlund</u>, the Ninth Circuit disapproved a district court's use of de novo review in which the district court had substituted its judgment for that of the bankruptcy trial court and reversed a determination of <u>Brunner</u> "good faith." The Ninth Circuit, in turn, reversed the district court because it erred by applying the wrong standard of review: "a good faith finding under <u>Brunner</u> should be reviewed for clear error." <u>Hedlund v. Educ. Res. Inst. Inc.</u>, 718 F.3d 848, 854 (9th Cir. 2013). In short, <u>Hedlund</u> holds it is error for an appellate court to substitute its judgment for that of the trial court on the question of <u>Brunner</u> "good faith."

The Ninth Circuit explained that "good faith" is "an essentially factual inquiry" driven by "data of practical human experience." <u>Hedlund</u>, 718 F.3d at 854, <u>citing Figter Ltd. v. Teachers Ins. & Annuity Assoc. of Am. (In re Figter Ltd.)</u>, 118 F.3d 635, 638 (9th Cir. 1997); <u>accord</u>, <u>United States v. McConney</u>, 728 F.2d 1195, 1203-04 (9th Cir. 1984) (en banc).

Nor is the Ninth Circuit position regarding review of "good faith" unique. The Seventh Circuit (which applies <u>Brunner</u> under the name <u>Roberson</u>) has reached the identical conclusion on the same reasoning: the <u>Brunner</u> good faith standard "combines a state of mind (a fact) with a legal characterization (a mixed question of law and fact) that Supreme Court precedent teaches be "treated as factual in nature." <u>Krieger v. Educ. Credit Mgmt. Corp.</u>, 713 F.3d 882, 884 (7th Cir. 2013) ("It is important not to allow judicial glosses, such as the language in <u>Roberson</u> and <u>Brunner</u>,

1 to supersede the statute itself.") (Easterbrook, J.).[7]

2

3                                    II

4                    The "Mixed Question" Conundrum

5      Despite the apparent clarity of a "clear error" review,

6 confusion persisted. Student loan creditors that lost "undue

7 hardship" cases in bankruptcy court would appeal and urge the

8 appellate court to substitute its judgment for that of the trial

9 court. Implicit in the arguments was a sense that "undue

10 hardship" is some form of a "mixed question" for which it is fair

11 game to substitute judgment on appeal.

12      An example is the district court's reversal of the Hedlund

13 bankruptcy court, which the Ninth Circuit later reversed for

14

15

16 _____

17      [7]The Seventh Circuit's Krieger decision is indicative of a
growing realization that something is rotten in Brunner. The
18 critiques come from two directions. First, per Krieger, too much
judicial gloss has transmogrified Brunner. Second, the question
19 in Brunner (what showing is required to prove "undue hardship"
when discharge is automatic after five years?) is very different
20 than the question after the automatic discharge was repealed
(what showing is required to prove "undue hardship" when it is
21 the only route to discharge lifetime?). Judge Pappas was an early
voice crying in the wilderness: Roth v. Educ. Credit Mgmt Corp.
22 (In re Roth), 490 B.R. 908, 920-23 (9th Cir. BAP 2013). The
chorus is gaining volume. E.g., McDowell v. Educ. Credit Mgmt
23 Corp. (In re McDowell), 549 B.R. 744, 765-66 n.32 (Bankr. D.
Idaho 2016); Rosenberg v. N.Y. State Higher Educ. Servs. Corp.
24 (In re Rosenberg), 610 B.R. 454, 458-59, 373 Ed. Law Rptr. 836
(Bankr. S.D.N.Y. 2020); Clavell v. U.S. Dep't of Educ. (In re
25 Clavell), 611 B.R. 504, 513-14 (Bankr. S.D.N.Y. 2020); Wolfson v.
DeVos (In re Wolfson), 2022 WL 5055468 (Bankr. D. Del. 2022). See
26 generally Bruce Grohsgal, The Long Strange Trip to a Certainty of
Hopelessness: The Legislative and Political History of the
27 Nondischarge of Student Loans in Bankruptcy, 95 Am. Bankr. L.J.
443 (2021).

28

1  using an improper standard of review. <u>Hedlund</u>, 718 F.3d at 854.[8]

2  A more subtle version is paying lip-service to "clear error"
3  but then using the "mixed question" label as license to nit-pick
4  the trial court all the way to reversal in a manner that is the
5  antithesis of "clear error" review. <u>E.g.</u> <u>Educ. Credit Mgmt. Corp.</u>
6  <u>v. Mason (In re Mason)</u>, 464 F.3d 878, 884-85 (9th Cir. 2006).

7
8                                    III
9           <u>Supreme Court Resolves "Mixed Question" Conundrum</u>
10  The "mixed question" conundrum was not unique to student
11  loans and befuddled appellate courts in a variety of arenas.

12  In 2018, parsing the Title 11 definition of "insider," the
13  Supreme Court cleared up the confusion about "mixed questions."

14  Giving a master class on the roles of trial and appellate
15  courts, the unanimous Supreme Court prescribed a controlling
16  analysis for assessing "mixed" questions of law and fact and the
17  proper implementation of "clear error" review. <u>U.S. Bank Nat'l</u>
18  <u>Ass'n v. Village at Lakeridge, LLC</u>, 138 S.Ct. 960, 965-69 (2018)
19  (9-0 decision) ("<u>Lakeridge</u>").

20
21                                    A
22                  <u>Roles of the Respective Courts</u>
23  The Supreme Court focused in <u>Lakeridge</u> on the roles of the
24  respective trial and appellate courts.

25  _____

26      [8]Before the Ninth Circuit squarely decided the "clear error"
    standard of review question in <u>Hedlund</u>, it had declined to find
27  error in a district court's substitution of judgment in an appeal
    in which it did not purport to determine the correct standard of
28  review. <u>Rifino v. United States (In re Rifino)</u>, 245 F.3d 1083,
    1087 n.2 (9th Cir. 2001) (de novo review.)

A bankruptcy court "must tackle three kinds of issues – the first purely legal, the next purely factual, the last a combination of the other two." <u>Lakeridge</u>, 138 S.Ct. at 965.

An appellate court "must consider all its component parts, each under the appropriate standard of review." <u>Lakeridge</u>, 138 S.Ct. at 965.

The first step is choice by the bankruptcy judge of a legal test to determine the issue before the court at trial. An appellate panel "reviews such a legal conclusion without the slightest deference." <u>Lakeridge</u>, 138 S.Ct. at 965.

Next, the bankruptcy judge must "make findings of what we have called 'basic' or 'historical' fact – addressing questions of who did what, when or where, how or why. <u>Lakeridge</u>, 138 S.Ct. at 966.

An appellate court reviews such factual findings "only for clear error – in other words, with a serious thumb on the scale for the bankruptcy court." <u>Lakeridge</u>, 138 S.Ct. at 966.

Finally, the bankruptcy judge must "determine whether the historical facts found satisfy the legal test." This is the so-called "mixed question" that asks "whether the historical facts ... satisfy the statutory standard, or to put it another way, whether the rule of law as applied to the established facts is or is not violated." <u>Lakeridge</u>, 138 S.Ct. at 966, <u>quoting</u> <u>Pullman-Standard v. Swint</u>, 456 U.S. 273, 289, n.19 (1982).

The problem becomes whether the ruling on the mixed question is to be reviewed on appeal de novo or for clear error.

1

B

2    <u>Nature of the Mixed Question Controls Standard of Review</u>

3      As posited by the Supreme Court, the inquiry is: "What is

4 the nature of the mixed question here and which kind of court

5 (bankruptcy or appellate) is better suited to resolve it?"

6 <u>Lakeridge</u>, 138 S.Ct. at 966.

7      Mixed questions "are not all alike." <u>Lakeridge</u>, 138 S.Ct. at

8 967.

9      When a particular mixed question requires courts "to expound

10 on the law, particularly by amplifying or elaborating on a broad

11 legal standard" and "developing auxiliary legal principles of use

12 in other cases," then de novo review is appropriate. <u>Lakeridge</u>,

13 138 S.Ct. at 967, <u>citing</u> <u>Salve Regina College v. Russell</u>, 499

14 U.S. 225, 231-33 (1991).

15      When a mixed question "immerses courts in case-specific

16 factual issues – compelling them to marshal and weigh evidence,

17 make credibility judgments, and otherwise address what we have

18 (emphatically if a tad redundantly) called 'multifarious,

19 fleeting, special, narrow facts that utterly resist

20 generalization,'" then appellate courts should review the

21 decision with deference. <u>Lakeridge</u>, 138 S.Ct. at 967, <u>citing</u>

22 <u>Pierce v. Underwood</u>, 487 U.S. 552, 561-62 (1988); <u>Anderson v.</u>

23 <u>Bessemer City</u>, 470 U.S. 564, 574-76 (1985).

24      After <u>Lakeridge</u>, the rule is: "the standard of review for a

25 mixed question all depends — on whether answering it entails

26 primarily legal or factual work." <u>Lakeridge</u>, 138 S.Ct. at 967.

27

28

C

## "Mixed Questions" in "Undue Hardship" Cases

The mixed question that a bankruptcy court addresses in a § 523(a)(8) "undue hardship" student loan discharge case immerses the court in case-specific factual issues. The controlling law – the <u>Brunner</u> test – is well known and needs little explication.

The bankruptcy court, to use the words of the Supreme Court, "takes a raft of case-specific historical facts, considers them as a whole, balances them one against another – all to make a determination:" whether the debtor's current income and expenses permit a "minimal" standard of living for herself and her dependents; whether additional circumstances make the state of affairs likely to persist for a significant portion of the repayment period of the student loan; and whether the debtor has made a "good faith" effort to repay the loans.

As the Supreme Court explained in <u>Lakeridge</u>: "Just to describe that inquiry is to indicate where it (primarily) belongs: in the court that has presided over the presentation of the evidence, that has heard all the witnesses, and that has both the closest and the deepest understanding of the record – <u>i.e.</u>, the bankruptcy court." <u>Lakeridge</u>, 138 S.Ct. at 968.

The Supreme Court also reasoned that an alternative approach which gets to the same answer is to ask how much legal work is entailed in applying the controlling test? Its answer was "precious little." Norms and criteria already exist. The multi-part test is already in place.

Since answering the § 523(a)(8) "undue hardship" question is primarily factual in nature, it follows that deferential "clear

error" review applies when, as here, the bankruptcy court holds a trial and makes findings of fact and conclusions of law.[9]

The import of _Lakeridge_ to this adversary proceeding is that it undermines the vitality of Ninth Circuit decisions that are not consistent with the _Lakeridge_ "mixed question" rule. _Rifino_ permitted a district court to substitute judgment for that of the bankruptcy court in a manner disapproved by _Lakeridge_. _Rifino_, 245 F.3d at 1087 n.2. Likewise, the nit-picking analysis of "good faith" in _Mason_ is contradicted by _Lakeridge_. _Mason_, 464 F.3d at 884-85. Both _Rifino_ and _Mason_ were garden-variety decisions in which a bankruptcy court found "undue hardship."[10]

IV

§ 523(a)(8) "Undue Hardship" in this Case

We now return to applying the three-part _Brunner-Pena_ test to the facts of this case.

---

[9]When bankruptcy courts decide student loan cases without trial, appellate courts correctly apply de novo review and may substitute judgment for that of the bankruptcy court. That was the situation in the original _Brunner_ case. Subsequent examples show that appellate courts that view records only in the abstract and do not have to look debtors in the eyes do not hesitate to reverse "undue hardship" determinations on review de novo.

[10]The Supreme Court was insistent about the line it was drawing regarding "mixed questions" in which facts predominate:

   if an appellate court someday finds that further refinement of the arm's length standard is necessary to maintain uniformity among bankruptcy courts, it may step in to perform that legal function. By contrast, what it may _not_ do is review independently a garden-variety decision, as here, that the various facts found amount to an arm's length (or non-arm's-length) transaction and so do not (or do) confer insider status.

_Lakeridge_, 138 S.Ct. at 968 n.7 (emphasis in original).

A

The first step is whether the debtor "cannot maintain, based on current income and expenses, a 'minimal' standard of living for [self] and dependents if forced to repay the loans." <u>Pena</u>, 155 F.3d at 1111; <u>Brunner</u>, 831 at 396.

The debtor's gross income in 2019 was $40,681. In 2021, it was $40,992. She works full time. Opportunities for overtime work are too infrequent to be deemed material.

Her monthly obligations at the time of trial totaled $3,763 and after taxes take-home pay was $2,807. Her grandmother has been helping her cover the imbalance.

Examination of the items on her monthly budget reveals no excessive items.

This trier of fact is persuaded by preponderance of evidence that the debtor is not able to maintain a "minimal" standard of living for herself and dependents if forced to repay the loans.

B

Second, the debtor must show that "additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans." <u>Pena</u>, 155 F.3d at 1111; <u>Brunner</u>, 831 at 396.

The circumstances of the debtor are such that this trier of fact is persuaded by preponderance of evidence that this state of affairs is likely to persist for at least the remaining portion of the repayment period, and well beyond.

The debtor has demonstrated that she is doing the best she can. There is no upward career path presently available to the

debtor. There is no reason to believe her compensation will

increase by more than the rate of inflation.

In addition, as with Pena, the low value of the Ashford

education may be considered as evidence probative of the

likelihood that the state of affairs will persist. Pena, 155 F.3d

at 1114. It is particularly pertinent that the California

Attorney General obtained a judgment against Ashford "for

misleading students about career outcomes, cost and financial

aid, pace of degree programs, and transfer credits."[11]

Moreover, as Ashford is no longer an operating entity there

is no realistic opportunity to resume her academic program. It is

doubtful that transfer credits would be accepted. Even if it were

possible to resume the education, additional debt would have to

be incurred and opportunities for promotion upon completion are

too speculative to be credited.

In sum, the preponderance of evidence demonstrates that the

present state of affairs is likely to persist for a long time.


C

Third, the debtor must have "made good faith efforts to

repay the loans." Pena, 155 F.3d at 1111; Brunner, 831 at 396.

It is conceded that the debtor never has been in default on

payments.

A total of $3,052 was paid on the two timely proofs of claim

filed by the United States in the chapter 7 case.

This court specifically rejects the argument by the United

_____

[11]Note 2 supra.

States that the chapter 7 dividend should not be treated as having been voluntary and made in "good faith." Rather, as a matter of law and of fact, payments on claims in a voluntary case under the Bankruptcy Code that was filed by the debtor in good faith are "voluntary" payments that are made in good faith for purposes of the "good faith" component of the Brunner-Pena test.

In addition, after filing her voluntary chapter 7 case in January 2019, the debtor made voluntary additional payments totaling $50.59. The notice to the debtor in January 2021, that required payment under her "REPAYE" flexible repayment plan would increase to $284.00 per month is what precipitated the filing of this adversary proceeding.

Nor is the debtor's "good faith" undermined by not now seeking potential new administrative remedies that have arisen since this adversary proceeding was filed – she has heretofore participated in good faith in seeking administrative relief and been rewarded with a $284.00 monthly payment that is plainly beyond her means to pay. Enough is enough.

In sum, the debtor has demonstrated by preponderance of evidence "good faith efforts to repay the loans" within the meaning of the Brunner-Pena test.

## V

## Administrative Alternatives

The United States has provided a post-trial statement asking that Love apply for "Borrower Defense" administrative relief in lieu of a § 523(a)(8) "undue hardship" judgment.

It is suggested that the debtor is a member of the class

21

action known as <u>Sweet v. Cardona</u>, No. C 19-03674 WHA (N.D. Cal.), the settlement of which could qualify the debtor for a refund of $1,033.04. And it is urged that she pursue the "New Process" for student loan bankruptcy discharges as an administrative matter. This court declines the invitation.[12]

A

The debtor's evidence adduced at trial establishes by the requisite preponderance of evidence all three elements of the <u>Brunner-Pena</u> test. She is entitled to a judgment determining that excepting the total student loan debt from discharge would impose an "undue hardship" on the debtor and the debtor's dependents within the meaning of § 523(a)(8). She is entitled to the relief now without awaiting mere possibilities of administrative relief.

There is no requirement of law that administrative remedies have been exhausted before a § 523(a)(8) "undue hardship" action is ripe for decision. Such a requirement, in view of the delays characteristic of the bureaucracy inherent in student loan administration, would be a contradiction in terms.

B

Much of the proposed administrative relief under the "New Process" announced November 17, 2022, remains uncertain and is embroiled in partisan litigation challenging the validity of that and other administrative initiatives.

---

[12]United States' Response to Post-Trial Order, at 2, Dkt 81.

C

The United States says: "Education is willing to refund Love the $1,033.04 distribution made to Education by the Chapter 7 trustee in this case, and <u>it believes the trustee has agreed to Education making this refund to Love</u>."[13] This is puzzling.

1

First, there is no Chapter 7 trustee serving in the case who could have agreed to anything. Upon entry of the Final Decree on March 26, 2020, the Chapter 7 trustee was discharged and the trustee's bond was released from further liability.[14]

When the case was reopened in 2021 pursuant to § 350(b) and Rule 5010 incident to filing Love's adversary proceeding, it was ordered that no trustee be appointed. 11 U.S.C. § 350(b); Fed. R. Bankr. P. 5010.[15] None has since been appointed.

Even if a trustee had been appointed, it is unlikely a Chapter 7 trustee could agree to a refund to the debtor of a claim distribution without complying with § 502(j) and at least giving notice to the other creditors who, like the Department of Education, received paltry 3.47% dividends and may wish to assert rights in the proceeds. 11 U.S.C. § 502(j).

2

Moreover, there is uncertainty about the relief that would

---

[13]<u>Id</u>. at 3 (emphasis supplied).

[14]Final Decree, 3/26/2020, Dkt. 42.

[15]Order Reopening Case, 6/21/2021, Dkt. 46.

be provided for Love by this proposed administrative action.

Her direct liability for the $27,270 that she owes on her own account is one thing.

But there is also potential for liability for the $57,697 owed on student loans to her former spouse that were contracted during the marriage and could construed as a community debt for which remaining community property – including Love's home – might be liable

The loan summary to the proof of claim #13 filed by the Department of Education on her former spouse's debt includes the intriguing notation "spousal consol." If that connotes spousal liability, then she has more student loan debt to discharge.

The uncertainty stems from California community property law with respect to liability and property settlements in divorces. At best, California law is sufficiently confused that it cannot be said with confidence that Love has no liability when there has been no completed marital settlement agreement. Compare Cal. Family Code § 916, with Cal. Family Code § 2641(b)(2).

Nor can the United States say the issue is fanciful. The U.S. Department of Education has litigated the effect of a California marital settlement agreement regarding allocation of student loan debt between divorcing spouses. U.S. Dep't of Educ. v. Carrion (In re Carrion), 601 B.R. 523 (9th Cir. BAP 2019).

3

Also dubious is a statement that could be construed as suggesting that discharging the debt under § 523(a)(8) could

disqualify the debtor for some student loan benefits.[16] Perhaps it is inept gobbledegook, but it could be construed as offending § 525(c). 11 U.S.C. § 525(c).

In short, blandishments of possible administrative relief are of uncertain value when compared with the alternative of immediate discharge of all of Love's student loan liability pursuant to § 523(a)(8) in an enforceable judicial judgment.

Conclusion

The debtor having proved by preponderance of evidence all elements of the controlling <u>Brunner-Pena</u> test for discharge of all of her student loan liability as "undue hardship" under § 523(a)(8), judgment to that effect will be entered in a separate order.

Dated: April 05, 2023

_____
United States Bankruptcy Judge

---

[16]The ambiguous statement is:

> Additionally, new Education provisions will no longer count Pell Grants received for the same period of attendance at school, as loans receiving Borrower Defense discharge for purposes of Pell Grant limits, restoring eligibility if Love chooses to return to school. However, if her loans are discharged through bankruptcy, she has no debt eligible for relief under the <u>Sweet v. Cardona</u> class action settlement and will not receive those benefits.

United States' Response to Post-Trial Order, at 3, Dkt 81.